THE STATE, Respondent, v. HOUSER, Appellant.

1. State v. McO'Blenis, 24 Mo. 402, affirmed.
2. A deposition of a witness, taken upon the preliminary examination before a committing magistrate, in the presence of the accused, is not admissible in evidence on the trial upon proof that the witness is beyond the jurisdiction of the court.
3. If, however, the absence of the witness at the trial is procured by the defendant, the deposition would be admissible in evidence.

*Appeal from St. Louis Criminal Court.*

Stephen H. Houser was indicted in Gasconade county for the murder of William D. Farris. The cause was removed by change of venue to the St. Louis criminal court. At the trial, at the May term, 1857, the deposition of one Mary Henson, taken before the examining magistrate, was read in evidence against the defendant. It appeared that at the time of the homicide—July, 1853—said Mary Henson resided in Gasconade county; that when the venue was changed she was recognized to appear in the St. Louis criminal court; that she did appear in the court at the November term, 1856; and was again recognized to appear at the January term, 1857. At that term the cause was continued by the State on account of her absence. It appeared that said Mary Henson resided in Gasconade county from the date of the homicide until the fall of 1856; that about the date of her attendance in St. Louis at the November term, 1856, of the St. Louis criminal court, she disappeared and has not been since heard of. It also appeared that various subpoenas, directed to said Mary Henson, had issued from the St. Louis

criminal court and had been returned "not found" by the sheriff of Gasconade county and the marshal of St. Louis county.

The deposition was admitted and read. The defendant was convicted of murder in the first degree and was sentenced to be hung.

*U. Wright*, for appellant, contended (among other things) that the introduction of the deposition of Mary Henson against the accused was a grave and manifest violation of the bill of rights, and cited 2 Jones (Folio) 53; 6 Howell's State Trials, 771; 2 Russ. on Cr. 888; 8 Carr. & P. 167; 6 Cow. 163; 5 Rand. 701; 14 Mass. 237.

*Mauro*, (circuit attorney,) for the State.

I. The deposition of Mary Henson was admissible. The constitution does not interfere with the admission of such testimony. (State v. McO'Blenis, 24 Mo. 402.) The accused then met the witness face to face. The examination was competent to be read in evidence under some circumstances, and its admissibility is dependent entirely upon the rules of evidence. The State made every exertion in its power to secure the attendance of the witness. It could not possibly do more. If the witness were in fact dead she could not have been further beyond the power of the State. This deposition was not only evidence but the best evidence. What difference would it have made if the death of Mary Henson had in point of fact been established, for she could not have been further beyond the control of the State, and her death would not in the least degree have improved the character of the testimony? Had this been a civil suit the deposition would have been admissible under the facts presented. (1 Greenl. Ev. p. 217.) The rules of evidence in civil and in criminal cases are the same. (1 Greenl. Ev. p. 86; 1 Rosc. C. Ev. 73; 2 Russ. on Cr. 588; U. S. v. Macomb, 5 McLean, —; 18 Pick. 437; 15 Ala. 753; Davis State, 17 Ala. 357; State v. Hooker, 17 Verm. 658; U. S. v. Hood, 3 Wash. C. C. 444; Rex v. Watson, 2 Stark. 116; 26 How. St. Tr. 376; U. S. v. Britton, 2 Mason, 464.)

NAPTON, Judge, delivered the opinion of the court.

The principal question in this case is, whether the deposition of a witness taken before the examining court can be used against the prisoner on his trial, it appearing that the witness is beyond the jurisdiction of the court.

In the case of the State v. McO'Blenis, 24 Mo. 402, it was held, that where the witness was dead his deposition was admissible. The propriety of this decision has been questioned, and the subject has again been elaborately discussed with a view to its examination by this court as it is now constituted. This investigation by this court has been made, and it will be perhaps sufficient to say it has resulted in a conclusion to adhere to the former opinion. Without undertaking to add any thing to the reasoning upon which the decision of the court was placed in the former opinion, I will merely advert to one or two historical facts which seem to confirm the view then taken of the subject.

Upon the passage of the stamp act by the British parliament, one of the first of the colonial assemblies that passed resolutions in regard to it was the general assembly of Virginia. In these resolutions the general assembly assert that they were entitled to enjoy all the rights and privileges which were secured to British subjects. They declared " That the first adventurers and settlers of this his majesty's colony and dominion of Virginia brought with and transmitted to their posterity, and all other his majesty's subjects since inhabiting in this his majesty's colony, all the privileges and immunities that have been at any time held, enjoyed and possessed by the people of Great Britain." They further resolved, " That by the two royal charters granted by King James I., the colonies aforesaid are declared entitled to all privileges of faithful liege and natural born subjects to all intents and purposes as if they had been abiding and born within the realm of England." In 1774 the delegates from the colonies assembled in Congress, and one of their first acts was a declaration of rights of the colonies. Among other

resolutions, they declared " That our ancestors who first settled these colonies were, at the time of their emigration from the mother country, entitled to all the rights, liberties and immunities of free and natural born subjects within the realm of England." " That by such emigration they by no means forfeited, surrendered or lost any of those rights, but that they were, and their descendants now are, entitled to the exercise and enjoyment of all such of them as their local and other circumstances enable them to exercise and enjoy." " That the respective colonies are entitled to the common law of England, and more especially *to the great and inestimable privilege of being tried by the peers of the vicinage according to the course of that law.*" " That they are entitled to the benefit of such of the English statutes as existed at the time of their colonization and which they have by experience, respectively, found to be applicable to their several local and other circumstances." " That these his majesty's colonies are likewise entitled to all the immunities and privileges granted and confirmed to them by royal charters, or secured by their several codes of provincial laws."

These declarations, and others not deemed necessary to be copied here, will be found to have been subsequently transfused into the bills of rights and constitutions of nearly all the original thirteen states and from these into the constitutions of those states which have since been formed. One of the first, perhaps the first, was the bill of rights adopted by Virginia in June, 1776, in which is to be found the clause almost literally copied in our constitution. That clause is: " That in all capital or criminal prosecutions a man hath a right to demand the nature and cause of his accusation, to be *confronted* with the accusers and witnesses, to call for evidence in his favor, and to a speedy trial by an impartial jury of his vicinage, without whose unanimous consent he can not be found guilty," &c. It is thus seen that these declarations were first made at a time when loyalty to Great Britain was professed and honestly entertained; that, so far from being supposed to introduce new principles, they were expressly

and carefully pronounced to be the ancient rights and immunities which they brought with them from Great Britain, and which they considered themselves entitled to in common with all the subjects of Great Britain born within the realm of England. The common law and acts of parliament down to the fourth year of the reign of James I., adapted to their circumstances and the local laws of each colony, were the charters by which their right to life, liberty and the pursuit of happiness was to be secured and tested.

When the bill of rights, drawn up, I believe, by George Mason, and the constitution of Virginia were adopted, Congress had not yet passed the declaration of independence. Although, so far as political principles and forms of government are concerned, we would of course look for material innovations upon such as had been previously established and which a separation from Great Britain necessarily produced, yet it would hardly be expected that in the midst of a revolution, when the minds of all men would be chiefly drawn to these contemplated or effected political changes, attempts would be made in a constitution or bill of rights to introduce new codes of procedure or new principles of evidence to govern the progress of ordinary trials in civil or criminal cases. Our forefathers were satisfied with the common law, so far as its great leading features were concerned; and they considered themselves as securing every thing that was important and valuable in relation to mere municipal rights of persons and property when they solemnly and repeatedly adopted it and declared it to be their birth-right. This common law they did not understand as the common law under the Plantagenets or Tudors or Stuarts, but as it was understood *at that day*, both in England and this country, when the revolution of 1688 and the subsequent parliamentary and judicial constructions had restored it to its primitive purity, and abolished its occasional abuses in bad times and under corrupt administrations.

Now it is admitted that no case is to be found in England in which the deposition of a witness, taken in the presence of

the accused, has been excluded where the witness has died since the examination. Numerous cases have been cited where such depositions have been admitted. It is true that there may be a few cases in which depositions, taken before coroners in England without any opportunity of cross-examination, have been used against the accused, where the witness subsequently died; but the authority of such cases is questioned, even in that country, by their ablest writers on common law—Starkie, Roscoe, Russell—and it is doubtful whether such testimony would be now received. At all events, such testimony has never been permitted in this country, and in England its admissibility has been altogether placed upon the peculiar dignity and importance attached to the office of coroner; and no such reasons exist here. So, in England the times have been when the accused was not allowed witnesses, nor counsel, but such abuses of justice had been swept away long before our separation from that country. Many other abuses would probably be found, especially in prosecutions for political offences; but our ancestors did not adopt the constructions given to the law of England by Jeffries, but as it was understood in its purity, as it was settled in their highest courts in times when the rights of British subjects were well understood and thoroughly confirmed, and, even then, modified as it may have been to some extent by local laws and usages in this country. But we find further, that not only is there no authority in England which excludes the testimony of a deceased witness, under the circumstances accruing in the case of McO'Blenis, but *none is to be found in this country.* A case is referred to from Tennessee, in the opinion of Judge Leonard, which I have not seen, but this case is overruled, and two cases are found from that state, of a later date, which hold the law to be as it was decided in the O'Blenis case. It may be said then with propriety that there is no authoritative decision in this country excluding such testimony.

I have referred particularly to the Virginia bill of rights, because it was the first that was framed in this country, fol-

lowing substantially and essentially, though more in detail, the declaration made two years before by the congress of all the colonies; which latter was in truth the ground-work upon which not only the Virginia bill of rights, but nearly all the constitutions and bills of rights subsequently framed, were based. Moreover, as in Kentucky, so in Missouri, our introduction of the common law was framed upon the model of the Virginia statute, and adopted the British law, common and statutory, with the same modifications and up to the same period (the fourth year of James I.) as had been adopted in Virginia. The provision in our constitution now under consideration is also manifestly a copy, substantially, of the Virginia bill of rights, for it is not to be supposed that the substitution of the words "face to face" for the word "confronted" was designed to make any change in the meaning.

In the case of Finn v. The Commonwealth, 5 Rand. p. 701, oral proof of what had been testified to by a witness before an examining court was offered, but excluded on the ground that the witness (whose testimony was sought to be reproduced) was not dead. This would seem to concede that if the death of the witness had appeared, the evidence might have been given. The principle is expressly recognized in Johnson v. The State, 2 Yerg. 58; Thorp v. State, 15 Ala. 792; Beebe v. The People, 5 Hill, —; Bostwick v. The State, 3 Humph. 345; 1 Root, 7.) There are other cases said to decide the same principle which I have not examined.

The admission of dying declarations, as they are termed, seems to occupy precisely the same ground as that of the deposition of the deceased witness. If the constitution excludes the one it must exclude the other. To say that the witness who must meet the accused "face to face" is he who repeats what the dying man has said, is a mere evasion; and if the constitution admits of this evasive interpretation in relation to the dying declarations, it is just as easy to apply the same rule of construction to the deposition of the dead witness. It may with as much propriety be said that the witness, who rehearses according to the rules which the law

has provided in such cases what has been testified to orally by a deceased witness in a former trial, in the presence of the accused, or the magistrate who certifies to the deposition where the testimony has been reduced to writing, is the witness referred to in the constitution, whose presence " face to face" before the accused is provided for. But it is plain that in neither case is he the witness whose testimony is to affect the life or liberty or property of the accused. It is the dying man who is speaking through him, whose evidence is to have weight and efficacy sufficient it may be to take away the prisoner's life. The living witness is but a conduit pipe—a mere organ, through whom this evidence is conveyed to the court and jury. So is the magistrate who takes the deposition, or the by-stander who is able to repeat what has been testified to on a former trial by a witness in the presence of the accused. These two classes of testimony occupy the same ground, so far as the constitutional provision in question is concerned, except that in the case of dying declarations the real witness is not on oath and his declaration need not be in the presence of the accused. In the case of the deposition, the witness speaks under the sanction of an oath, and only in the presence of the accused, when an opportunity for cross-examination is afforded.

The admissibility of dying declarations has not been questioned. They have been frequently resorted to in this state, as well as elsewhere, without any suggestion ever having been made of a conflict with this constitutional provision. To exclude them on this ground would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at nought. But dying declarations, made under certain circumstances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished. The deposition of the deceased witness was also

permitted at common law; and the same rule of interpretation which allows the former under the constitution will admit the latter.

We shall not therefore disturb the decision of this court in the case of McO'Blenis. I do not know that my colleagues adopt the reasons which I have suggested, but all the court concur in letting the decision stand.

The point made in this case we do not however consider determined by the case of McO'Blenis. It may be that, so far as the constitutional provision referred to is concerned, the reason for admitting the deposition is just as conclusive in the one case as the other. If the witness is beyond reach of process, his presence is as utterly unattainable as though he were dead. But it does not follow that every kind of evidence, which this provision of our constitution does not exclude, is therefore legitimate testimony. The constitution did not propose to lay down specific rules of evidence. Its framers only thought it necessary to declare general principles. To determine whether any particular testimony is to be admitted or excluded we must look to the law as well as the constitution. Although it may not conflict with the constitution, it does not follow that it is therefore competent evidence. The admissibility of depositions in civil and criminal cases depends upon different grounds. It has been urged in this case that, with the exception of the constitutional provision which has been so often referred to, they both occupy the same grounds. Such is not understood to be the law. If it was, then the deposition or testimony taken before the examining court would be admissible in every case where the witness was prevented by bodily infirmity from attending court, or was at the time of trial more than sixty miles from the place of trial, or was a judge engaged in his official business. This question is to be determined by the common law, and not by our statute, which applies only to civil cases.

In England no authority is to be found, so far as this examination has discovered, where, in a criminal case, a depo-

sition, taken under the statutes of Phil. & Mary, was admitted merely because the witness was beyond seas or out of the reach of process of the court. In Morley's case, 2 Kelyng, 55, the resolution of the judges was that in case of death or absence by procurement of the prisoner or his friends, or in case of sickness from which there was no probability of recovery, the deposition could be used. It was at the same time held, that it was not sufficient to show that endeavors had been used to find the witness and that he could not be found. In Buller's N. P. 242, it is said that "if the witnesses examined on a coroner's inquest be dead, or *beyond sea*, their depositions may be read, for the coroner is an officer appointed on behalf of the public to make inquiry about the matters within his jurisdiction." This remark has been questioned, both as it related to depositions before coroners when the accused was not present, and especially so far as it declares that the mere absence of the witness will admit the deposition. (2 Starkie, 4, 491 ; Phillips Ev. 373.) The authorities cited by Buller to support this position are Bromwich's case, 1 Lev. 180, and the case of Thatcher & Waller, T. Jones, 53. In Bromwich's case the witness was dead, and there was therefore no such question before the court, and in Thatcher and Waller the deposition was one taken before the coroner, and, as we have seen, some peculiar importance was attached to the proceedings of this officer, and the court said that if the deposition had been taken before a magistrate it could not have been read. In Rex v. Huyon, 8 Carr. & P. 167, a deposition was offered, the witness being beyond seas, and Coltman, J., said that it was inadmissible *unless by consent*.

In this country the decisions have been the same way. In Beebe v. The People, 5 Hill, 32, absence from the state was held not to warrant the admission of the deposition. In Tharp v. The State, 15 Ala. 746, the same doctrine was asserted.

Upon principles of public policy the admission of such depositions, in the mere absence of the witness, is extremely

questionable, so that both principle and precedent concur in excluding them.    If the absence of the witness was procured by the prisoner the rule would be different.

We do not deem it necessary to notice particularly the other points made in this case.    As the case will be tried again, it is not probable that such questions will occur upon the second trial.    The judgment is reversed and the cause remanded.

RICHARDSON, J.    I wish merely to add that I do not approve of the doctrine laid down in the case of the State v. McO'Blenis, but I do not propose hereafter to oppose it, for having received the sanction of the majority of the judges who then composed the court, and having been since affirmed by my colleagues, the law may be considered as settled and the question at rest.