912 A.2d 1

Robert Eugene HEAD

v.

STATE of Maryland.

No. 499, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Dec. 5, 2006.

---

Matthew F. Davies (Douglas J. Wood, on brief), Riverdale, for appellant.

Celia Anderson Davis (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., SALMON, KRAUSER, JJ.

SALMON, J.

On Memorial Day, 2004, Kevin Darby, age twenty-four, was shot eight times. The Prince George's County police responded immediately to the scene of the shooting. The first police officer to arrive was Officer Jeremy George. With the strong smell of gunpowder still in the air, Officer George asked Darby: "Who shot you?" Darby answered: "Bobby"—referring to Robert Head. Darby died about forty minutes after giving this answer.

Head was charged and later found guilty of second-degree murder of Darby, along with the attempted second-degree murder of one Roderick Sanders, who was shot by the same gunman who fatally wounded Darby.[1]

Several questions are raised by Head in this appeal. The most important (and interesting) is: Did the trial court err in allowing Officer George to testify that the decedent told him that he had been shot by "Bobby"? Head claims that the court's decision to allow this statement into evidence was erroneous because it denied him the ability to confront the witnesses against him in contravention of the rights afforded him by the Sixth Amendment to the United States Constitution.

## I.

At the time Head was tried in the Circuit Court for Prince George's County and when this case was argued before us, the most recent pronouncement by the Supreme Court concerning the right-to-confront-witnesses issue raised by Head was *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford,* the Court held that the confrontation clause, with one possible exception, barred "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify,

---

1. Head was also convicted of two counts of use of a handgun in a crime of violence, first-degree assault, and second-degree assault. All told, he received an executed sentence of ninety-five years.

and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53–54, 124 S.Ct. 1354. Critical to the holding in *Crawford* was the phrase "testimonial statements," because (the court implied) only statements of that sort caused the out-of-court declarant to be a "witness" within the meaning of the confrontation clause. *Id.* at 51, 124 S.Ct. 1354. Non-testimonial statements by an out-of-court declarant, while still subject to traditional limitations upon hearsay evidence, are not governed by the confrontation clause.

About six weeks after we heard oral argument in the case *sub judice*, the United States Supreme Court decided *Davis v. Washington*, 547 U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In *Davis*, the Court said:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

126 S.Ct. at 2273–74 (footnote omitted).

In deciding the confrontation issue raised by Head, we shall use the just-quoted definition to decide whether the trial court erred in allowing Officer George to tell the jury what Darby said.

## II.

The central issue presented to the jury was whether Head was the criminal agent who fatally shot Darby and wounded Roderick Sanders. Head presented an alibi defense and

called several witnesses who testified that at the approximate time of the shooting he was elsewhere.

### A. *Roderick Sanders' Trial Testimony*

The State's star witness was Roderick Sanders. He testified that prior to the shooting he was well acquainted with Head. On the afternoon of the shooting, Head and Darby (a close friend of Sanders') visited Sanders' home in Upper Marlboro. Darby complained that he could not find a ring of keys that belonged to him, and throughout the afternoon, he talked about locating the keys. Finally, when Head, Darby, and Sanders were all sitting on the living room couch, making plans for the evening, Darby said that he wanted to look for the keys at the home of Head's girlfriend. Darby then remarked that he could kick in the door of the house to conduct the search, but he did not want to do so because Head was dating the woman whose house would be invaded. This remark upset Head, who immediately left the house. Head returned shortly thereafter, began pacing around, and then asked Darby and Sanders why his girlfriend "was becoming involved." Without waiting for a reply, Head (according to Sanders) next pulled out a gun and shot him and then repeatedly shot Darby. After the shooting, Head left the house. Darby then got up from the couch and ran into the kitchen where he collapsed. Sanders called 911 and reported the shootings.[2]

### B. *The Motion in Limine Hearing*

Prior to commencement of trial, appellant's counsel made a motion in limine to prevent the State from introducing into evidence the statement Darby made to Officer George. A hearing on the motion was held, out of the presence of the jury, on the morning of the first day of trial.

Officer George testified at the hearing that he arrived at Sanders' residence at 6:46 p.m., which was eight minutes after

---

**2.** In the 911 call, Sanders told the emergency operator that he had been shot by appellant.

the police received a 911 call advising them of a shooting at Sanders' home. Immediately after he entered the front door, Officer George saw Sanders lying injured on the living room couch. He went outside to get a first-aid kit in order to provide medical assistance to Sanders. When Officer George returned, Sanders told him that somebody else had also been shot. The officer followed a trail of blood into the kitchen. He found Darby lying on the kitchen floor. When Officer George first saw Darby, he "didn't seem to be in very good condition at all," although the officer "didn't see a lot of blood." One of Darby's arms appeared to be broken, and the victim kept moving the broken arm and "wasn't focusing on" the officer. When Officer George asked Darby if he was "okay," Darby "kept saying, 'help me, help me.' " Officer George next asked Darby "who shot him." Darby replied, "Bobby."

Officer George testified upon cross-examination by defense counsel that when he arrived at Sanders' house "a chaotic situation" existed. When he spoke to Darby, there was the "fresh smell of gunpowder in the air," and Officer George "didn't even know if . . . the person who caused that gunpowder was still in the house." Darby kept "yelling out" the words "help me, help me," and in the officer's view, it was still "potentially even a dangerous situation. . . ."

### C. *Resolution of the in Limine Motion*

Appellant's counsel, citing *Crawford, supra,* contended at the in limine hearing that Darby's out-of-court statement identifying appellant as the shooter was "testimonial" in that the inquiry by Officer George was made "for purposes of investigation."

Counsel for Head was asked by the court whether the statement by Darby came within the ambit of the "dying declaration" exception to the hearsay rule. *See* Md. Rule 5–804(b)(2). In reply, defense counsel took the position that because Darby's statement was "testimonial" it should be excluded under *Crawford,* whether it fit within the definition of one or more of Maryland's exceptions to the hearsay rule.

In the alternative, counsel argued that the dying declaration exception to the hearsay rule was inapplicable because there was insufficient proof that Darby believed that death was imminent at the time he identified the defendant as the person who had shot him.[3]

The trial court ruled that the statement made by Darby was an excited utterance and also met all the prerequisites of a dying declaration. Relying on a footnote in *Crawford*, the Court observed that the Supreme Court had "left for another day" the question of whether the distinction made in *Crawford* between testimonial and nontestimonial hearsay should be applied to the dying declaration exception to the rule prohibiting the admission of hearsay evidence.[4] The trial judge said:

> I do not believe that ... the United States Supreme Court or any court applying *Crawford* will rule that [dying declarations should be excluded from evidence], nor have [any courts] to date [ruled], that ... to admit a dying declaration ... under the facts of this case would deny the

---

**3.** Defense counsel did not contend that the requirement for the application of the excited utterance exception to the hearsay rule had not been met.

**4.** The trial court was referring to Footnote 6 in the *Crawford* opinion, which reads:

> The one deviation we have found [from the common law rule excluding testimonial statements by persons unavailable for cross-examination] involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. *See, e.g., Mattox v. United States,* 156 U.S. 237, 243–244, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *King v. Reason,* 16 How. St. Tr. 1, 24–38 (K.B.1722); 1 D. Jardine, Criminal Trials 435 (1832); Cooley, Constitutional Limitations, at 318; 1 G. Gilbert, Evidence 211 (C. Lofft ed. 1791); see also F. Heller, The Sixth Amendment 105 (1951) (asserting that this was the *only* recognized criminal hearsay exception at common law). *Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.* See Woodcock, supra, at 501–504, 168 Eng. Rep., at 353–354; *Reason, supra,* at 24–38; Peake, supra, at 64; cf. *Radbourne, supra,* at 460–462m 168 Eng. Rep., at 332–333. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. *If this exception must be accepted on historical grounds, it is sui generis.*

541 U.S. at 56, 124 S.Ct. at 1367 (emphasis added).

defendant due process under either the United States or Maryland Constitutions. . . .

The trial judge did not say explicitly whether he believed the objected-to testimony was "testimonial." But the court ruled that the statement made to Officer George, in which Darby identified appellant as the man who shot him, was admissible. The court then granted defense counsel, pursuant to Maryland Rule 2–517(b)(2), a continuing objection to any testimony by Officer George concerning what Darby told him.[5]

## III.

■ In this appeal, Head does not take issue with the proposition that Darby's statement fell within two firmly rooted exceptions to the hearsay rule, i.e., the excited utterance exception and the exception for dying declarations.[6]

■ Appellant argues that the *Crawford* case made it "clear that a direct accusation of a past crime admitted in lieu of the accuser's live testimony at trial is a core testimonial statement requiring confrontation." As will be shown, appellant reads the holding in *Crawford* too broadly.[7]

---

**5.** Maryland Rule 2–517(b) reads:

> **Continuing objections to evidence.** At the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope.

**6.** Maryland Rule 5–803(b)(2) provides an exception to the hearsay rule for "excited utterances," defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

> Maryland Rule 5–804 states that, provided that the declarant is unavailable, an exception to the hearsay rule applies to a
> [s]tatement under belief of impending death. In a prosecution for an offense based upon an unlawful homicide, attempted homicide, or assault with intent to commit a homicide . . . a statement made by a declarant, while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death.

**7.** Whether a statement by an out-of-court declarant is testimonial and thus subject to the evidentiary restrictions is a question of constitutional

In *Crawford*, it was unnecessary for the Court to define precisely what it meant by the word "interrogations," *id.* at 53, 124 S.Ct. 1354, when it said, "Statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." 541 U.S. at 52, 124 S.Ct. 1354. But in *Davis, supra,* the Supreme Court was required to answer that precise question. *See Davis,* 126 S.Ct. at 2276.

The *Crawford* case concerned the admissibility of a tape-recorded statement given to the police by Sylvia Crawford ("Sylvia") at a police station. The statement was used by the State of Washington when it prosecuted Sylvia's husband, Michael Crawford ("Michael"), for assault with intent to murder one Kenneth Lee. Lee was stabbed by Michael after Sylvia told her husband that Lee had tried to rape her. *Crawford,* 541 U.S. at 39, 124 S.Ct. 1354. At trial, Michael interposed a claim of self-defense. Sylvia did not testify at trial because of the State's marital privilege. Over defense counsel's objection, the State introduced Sylvia's tape-recorded statement into evidence. *Id.* at 38–39, 124 S.Ct. 1354. The State's theory in admitting the hearsay statement was that it came within an exception to the hearsay rule that allowed for admissions against penal interest made by out-of-court declarants.[8] *Id.* at 40, 124 S.Ct. 1354.

Sylvia's tape-recorded statement was unhelpful to Michael because "it implicated . . . [him] in Lee's stabbing and at least arguably undermined his self-defense claim." *Id.* at 65, 124 S.Ct. 1354. The *Crawford* Court held that Sylvia's tape-recorded statement was testimonial and that the introduction of the statement violated Michael's Sixth Amendment right to confront the witnesses against him. *Id.* at 70, 124 S.Ct. 1354.

In *Crawford,* the Court pointed out that

---

law subject to plenary review by an appellate court. *See Connecticut v. Kirby,* 280 Conn. 361, 379, 908 A.2d 506, 520 (2006).

**8.** In her tape-recorded statement, Sylvia Crawford admitted that she led her husband to the victim's apartment and therefore, according to the State, facilitated the assault upon the victim. *Crawford,* 541 U.S. at 40, 124 S.Ct. 1354.

Sylvia Crawford made her statement while in police custody, herself a potential suspect in the case. Indeed, she had been told that whether she would be released "depend[ed] on how the investigation continue[d]." . . .

*Id.* at 65, 124 S.Ct. 1354.

In *Davis,* the Supreme Court considered two appeals that were consolidated for argument, i.e., *Davis v. Washington* (No. 05–5224) and *Hammon v. Indiana* (No. 05–5705). *Davis,* 126 S.Ct. at 2270, 2272. In No. 05–5224, Adrian Davis, the petitioner, was charged by the State of Washington with felony violation of a domestic no-contact order. *Id.* at 2271. At Davis' trial, the State proved that on February 1, 2001, a 911 emergency operator in Washington state received a phone call from Davis' former girlfriend, Michelle McCottry. *Id.* at 2270. When the operator answered the call, the connection terminated before anyone spoke. *Id.* The operator reversed the call, and Ms. McCottry answered the phone. The operator and Ms. McCottry then engaged in a conversation in which the operator learned that a domestic disturbance between McCottry and her former boyfriend, Adrian Davis, had occurred. *Id.* at 2271. The pertinent part of the 911 conversation was as follows:

911 OPERATOR: Hello.

COMPLAINANT [McCOTTRY]: Hello.

911 OPERATOR: What's going on?

COMPLAINANT: He's here jumpin' on me again.

911 OPERATOR: Okay. Listen to me carefully. Are you in a house or an apartment?

COMPLAINANT: I'm in a house.

911 OPERATOR: Are there any weapons?

COMPLAINANT: No. He's usin' his fists.

911 OPERATOR: Okay. Has he been drinking?

COMPLAINANT: No.

911 OPERATOR: Okay, sweetie. I've got help started. Stay on the line with me, okay?

COMPLAINANT: I'm on the line.

911 OPERATOR: Listen to me carefully. Do you know his last name?

COMPLAINANT: It's Davis.

911 OPERATOR: Davis? Okay, what's his first name?

COMPLAINANT: Adrian.

911 OPERATOR: What is it?

COMPLAINANT: Adrian.

911 OPERATOR: Adrian?

COMPLAINANT: Yeah.

911 OPERATOR: Okay. What's his middle initial?

COMPLAINANT: Martell. He's runnin' now.

126 S.Ct. at 2271.

Approximately four minutes after the 911 call, police officers arrived at Ms. McCottry's residence and observed McCottry's "shaken state, the 'fresh injuries on her forearm and her face,' and her 'frantic efforts to gather her belongings and her children so that they could leave the residence.'" *Id.* at 2271 (quoting from *State v. Davis*, 154 Wash.2d 291, 296, 111 P.3d 844, 847 (2005) (en banc)). At Davis' trial, the two officers who responded to the scene testified that McCottry exhibited injuries that appeared to be fresh, but neither officer testified as to the cause of the injuries. *Id.* at 2271. McCottry did not testify; but, over Davis' objection, the trial court admitted, *inter alia*, the portions of the recording of McCottry's conversation with the 911 operator that are quoted above. *Id.* Davis was convicted of violation of the domestic no-contact order, and his conviction was affirmed by both the Washington Court of Appeals and the Washington Supreme Court. *Id.*

The Supreme Court was required in *Davis* to determine whether the statements made by McCottry to law enforcement personnel during the 911 call were "testimonial" and thus inadmissible based on the confrontation clause. *Id.* at 2270. In resolving that issue, the *Davis* Court first discussed what it had meant when it said in *Crawford* that "[s]tatements taken by police officers in the course of interrogations fit within the core class of testimonial statements." *Crawford,*

541 U.S. at 51, 124 S.Ct. 1354; *see Davis,* 126 S.Ct. at 2273. The Court said:

The questioning that generated the deponent's statement in *Crawford*—which was made and recorded while she was in police custody, after having been given *Miranda* warnings as a possible suspect herself—"qualifies under any conceivable definition" of an "interrogation," 541 U.S. at 53 n. 4, 124 S.Ct. 1354, 158 L.Ed.2d 177. We therefore did not define that term, except to say that "[w]e use [it] . . . in its colloquial, rather than any technical legal sense," and that "one can imagine various definitions . . ., and we need not select among them in this case." *Ibid.* The character of the statements in the present cases is not as clear, and these cases require us to determine more precisely which police interrogations produce testimony.

*Id.*

Later in its opinion, the *Davis* Court went on to say:

The question before us in *Davis,* then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in *Crawford, supra,* at 53, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) *interrogations solely directed at establishing the facts of a past crime,* in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in *Crawford,* " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. (The solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. *See, e.g., United States v. Stewart,* 433 F.3d 273, 288 (C.A.2 2006)

(false statements made to federal investigators violate 18 U.S.C. § 1001); *State v. Reed,* 2005 WI 53, ¶ 30, 280 Wis.2d 68, 695 N.W.2d 315, 323 (state criminal offense to "knowingly giv[e] false information to [an] officer with [the] intent to mislead the officer in the performance of his or her duty").) A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.

*Id.* at 2276 (emphasis added).

Judge Scalia, speaking for the Court in *Davis,* said that the portions of McCottry's 911 call quoted *supra* were not testimonial even though the statements were given to agents of law enforcement, *id.* at 2276–77, and identified Adrian Davis as the person who had physically attacked the complainant. The Court stressed four factors, none of which were present in the out-of-court declaration made by Sylvia Crawford in concluding that what Ms. McCottry said to the 911 operator was nontestimonial: (1) Ms. McCottry was speaking to a law enforcement agent about facts that were "actually happening," rather than describing past events; (2) unlike the out-of-court declarations made by Sylvia Crawford, Ms. McCottry was "facing an ongoing emergency" and was plainly making "a call for help against bona fide physical threats"; (3) the nature of what was asked and answered, viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past; and (4) Ms. McCottry's "frank answers" were provided over the phone in an environment that was not tranquil, or even (as far an any reasonable 911 operator could make out) safe, which contrasted with the situation in *Crawford* where the declarant "was responding calmly, at the station house, to a series of questions, with the officer interrogator taking and making notes of her answers . . . ." *Id.* at 2276–77.

The *Davis* Court was careful to point out that "conversations which begin as an interrogation to determine the need

for emergency assistance can evolve into testimonial statements once that purpose has been achieved." *Id.* at 2277. The Court explained:

> In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford,* 541 U.S. at 53 n. 4, 124 S.Ct. 1354, 158 L.Ed.2d 177. This presents no great problem. Just as, for Fifth Amendment purposes, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect," *New York v. Quarles,* 467 U.S. 649, 658–659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), trial court will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.[9]

*Id.*

In resolving the companion case (No. 05–5705), the *Davis* Court was called upon to decide if an out-of-court statement made by one Amy Hammon ("Amy") was testimonial hearsay and therefore inadmissible. *Id.* at 2272–73. On the night of February 26, 2003, the police responded to the home of Hershel and Amy Hammon due to a report of a "domestic disturbance." *Id.* at 2272. Amy gave the police permission to

---

**9.** In *Davis,* portions of the 911 tape, which we have not quoted, were also admitted into evidence. The United States Supreme Court was not required to decide whether the admission of the other parts of the 911 tape (which were testimonial) was harmless error—as the Washington Supreme Court had held.

enter the home, and when the officers did so, they noticed that the glass front to a gas heating unit had been broken and flames were being emitted from the front of the unit. *Id.* The police found Hershel Hammon, Amy's husband, in the kitchen. He assured the officers that, although he and his wife had been in an argument, the argument had never been physical and everything "was fine now." *Id.* While one of the officers remained with Hershel, the other went into the living room to talk to Amy. The officer who interviewed Amy was later to testify at Hershel's trial that Amy told him that Hershel, during an argument, "pushed her onto the ground, had shoved her head into the broken glass of the heater, and that he had punched her in the chest twice...." *Id.* at 2272–73. While Amy was being interviewed by the police officer, Hershel made several attempts to participate in the conversation between the police and Amy. *Id.* at 2272. The officers insisted, however, that Hershel stay separate from his wife so that they could investigate what had occurred.

After discussing the events with Amy, the police had her fill out an affidavit in which she handwrote the following: "Broke out Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke out lamp & phone. Tore up my van where I couldn't leave the house. Attacked my daughter." *Id.*

Amy was not available to testify at trial because she disobeyed a subpoena. The trial judge, over Hershel's counsel's objection, allowed Amy's affidavit to be admitted into evidence as a "present sense impression." *Id.* Amy's oral statement to the police officers was admitted as an "excited utterance."

Hershel was convicted at a bench trial of domestic battery and probation violation. *Id.* His convictions were affirmed by the Indiana Supreme Court, which concluded that Amy's oral statement was not "testimonial" and was admissible for state-law purposes as an excited utterance. The Indiana Supreme Court also concluded that, although Amy's affidavit *was* testimonial and therefore should not have been admitted, the

admission of the affidavit was harmless beyond a reasonable doubt. *Id.* at 2273.

The *Davis* Court reversed Hershel's conviction due to the erroneous admission of the testimony concerning what Amy orally told the police. In doing so, Judge Scalia, for the Court, said:

It is true that the *Crawford* interrogation was more formal. It followed a *Miranda* warning, was tape-recorded, and took place at the station house, see 541 U.S. at 53 n. 4, 124 S.Ct. 1354, 158 L.Ed.2d 177. While these features certainly strengthened the statements' testimonial aspect—made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events—none was essential to the point. It was formal enough that Amy's interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his "investigat[ion]." ... What we called the "striking resemblance" of the *Crawford* statement to civil-law *ex parte* examinations, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, is shared by Amy's statement here. Both declarants were actively separated from the defendant—officers forcibly prevented Hershel from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; that are inherently testimonial.

\* \* \*

Although we necessarily reject the Indiana Supreme Court's implication that virtually any "initial inquiries" at the crime scene will not be testimonial, see 829 N.E.2d at 453, 457, *we do not hold the opposite—that no questions at the scene will yield nontestimonial answers.* We have already observed of domestic disputes that "[o]fficers called

to investigate ... need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Hiibel,* 542 U.S. at 186, 124 S.Ct. 2451, 159 L.Ed.2d 292. Such exigencies may *often* mean that "initial inquiries" produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial. *Cf. Crawford, supra,* at 52 n. 3, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Id.* at 2278–79 (footnotes omitted) (emphasis added).

We turn now to the job of applying the teachings of *Davis* and the progeny to the case at hand. On August 29, 2006, the United States Court of Appeals for the Eighth Circuit decided a post-*Crawford* case involving facts that bear a close resemblance to those presented in the case *sub judice. See United States v. Clemmons,* 461 F.3d 1057 (8th Cir.2006).

One of the issues presented in *Clemmons* was whether the trial court erred in denying a pretrial motion that sought to preclude the prosecution from introducing into evidence a statement made to the police on October 20, 2002, by one Jamil Williams. *Id.* at 1058, 1060. On October 20, two police officers were dispatched to an address in Kansas City, Missouri; when they arrived at the address, they found Williams "lying on the ground with a pool of blood gathering on his right leg." *Id.* at 1058. Although Williams had been shot multiple times, he was talking on a cell phone in a calm voice when the officers first saw him. *Id.* at 1058, 1060. Officer Steven Lester approached Williams and asked him to terminate the call. Williams did so. *Id.* at 1059. Lester asked Williams who had shot him. Williams replied that he had been shot by Antonio Clemmons (appellant). He also advised that Clemmons had stolen his pistol and that Clemmons had attempted to rob him one month earlier in Independence, Missouri. *Id.* at 1059.

Williams was murdered about six weeks after he made the statement implicating Clemmons. *Id.* Thereafter, Clemmons was indicted on felony gun charges arising out of his (alleged) theft of the gun from Williams. *Id.* The trial judge denied Clemmons' motion to exclude from evidence the statement Williams made to Officer Lester. On appeal, Clemmons' conviction was affirmed. *Id.* at 1062. The Court said:

> Viewing the facts in the light of the Supreme Court's decision in *Davis*, we conclude that Williams's statements to Officer Lester were nontestimonial. The circumstances, viewed objectively, indicate that the primary purpose of Lester's questions was to enable him to assess the situation and to meet the needs of the victim. Officer Lester testified that he had parked his vehicle several houses away from the address to which he was dispatched "due to the fact that there could be a party armed." ... When the officers arrived at the scene, Williams was lying in front of a neighbor's house, suffering from multiple gunshot wounds. Officer Lester further testified that his purpose in speaking to the victim was "[t]o investigate, one, his health to order him medical attention and, two, try[ ] to figure out who did this to him." ... Any reasonable observer would understand that Williams was facing an ongoing emergency and that the purpose of the interrogation was to enable police assistance to meet that emergency. Accordingly, because Williams's statements were nontestimonial, they do not implicate Clemmons's right to confrontation.

*Id.* at 1060–61 (references to transcript omitted).

As in *Clemmons*, "[a]ny reasonable observer would understand that [Darby] was facing an ongoing emergency and that the purpose of the interrogation was to enable police assistance to meet that emergency." Three main facts support this conclusion. First, as Officer George testified, the situation was "chaotic." Second, the scent of gunpowder in the air would mean to an objective observer that the crime was very recent and the situation was dangerous—at least potentially— because Officer George did not know whether the criminal

who shot Darby was still in the house. Third, immediately before he identified his attacker, Darby was crying for help.

As mentioned earlier, the *Davis* Court said that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis, supra,* 126 S.Ct. at 2273. Darby's statement met that test.

It is true that, at the in limine hearing, no inquiry was made of Officer George regarding his primary purpose for asking Darby the question at issue. But the test to be applied is objective. Although Sanders testified at trial that Head left the house immediately after the shooting, Officer George was unaware of that fact when he questioned Darby. The officer needed to know, for safety reasons, who shot Darby. By way of example, if Darby had said that he had been shot by Roderick Sanders, this information would allow the officer to take precautions to protect himself and Darby. The same would be true if Darby had given no name in response to the question but instead identified the shooter by disclosing his whereabouts (e.g., "the man who shot me is in the basement").

■ The *Davis* case instructs us that statements *are testimonial* "when the circumstances objectively indicate that there is no such ongoing emergency *and* that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 126 S.Ct. at 2273–74. Viewed objectively, the primary purpose of Officer George's question does not appear to have been either to establish or prove past events for possible use at a trial.

*Davis* made explicit what had been strongly implied in *Crawford,* i.e., the confrontation clause set forth in the Sixth Amendment to the United States Constitution applies only to testimonial hearsay. *Davis,* 126 S.Ct. at 2274–76. The statement made by Darby was nontestimonial. Thus, appellant's right to confront witnesses was not violated when the trial

court allowed Officer George to testify as to what Darby told him.[10]

---

**10.** The State argues that it does not matter whether Darby's statement was testimonial because the Supreme Court, in *Crawford*, "did not extend its ruling to dying declarations." Actually, the Supreme Court, in *Crawford*, simply left open the question as to whether the testimonial-nontestimonial distinction was applicable to statements that fell within the ambit of the common law rule that dying declarations, although hearsay, were admissible. *See* fn. 3, *supra*. Some courts, which have decided cases since *Crawford*, have ruled that, even if a statement contained in a dying declaration is "testimonial," it is still admissible. Other courts reject that view. It is, however, unnecessary for us to decide this issue.

In *People v. Monterroso*, 34 Cal.4th 743, 22 Cal.Rptr.3d 1, 101 P.3d 956 (2004), the Supreme Court of California said:

Defendant asserts that *Crawford* has abrogated the exception for dying declarations. Yet the holding of *Crawford* does no such thing, inasmuch as the challenged out-of-court statements there were admitted by the state court under a finding that the statements bore " 'particularized guarantees of trustworthiness.' " (*Crawford, supra,* 124 S.Ct. at 1357.) The analysis in *Crawford*, which relies heavily on the right of confrontation as it existed, "at common law, admitting only those exceptions established at the time of the founding" (*id.* at 1365), also fails to support defendant's position. Although the high court found "scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal case*" at common law (*id.* at 1367), "[t]he one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citations.] Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*." (*Id.* at 1367, fn. 6.) Confronted now with the precise issue, we conclude that the dying declaration in this case passes constitutional muster.

Dying declarations were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken. (T. Peake, Evidence (3rd ed. 1808) p. 64.) In particular, the common law allowed " 'the declaration of the deceased, after the mortal blow, as to the fact itself, and the party by whom it was committed,' " provided that " 'the deceased at the time of making such declarations was conscious of his danger.' " (*King v. Reason* (K.B. 1722) 16 How. St. Tr. 1, 24–25). To exclude such evidence as violative of the right to confrontation "would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at

## IV.

◼ Appellant next argues that the "trial court erred when it failed to consider the unreliable nature of [Darby's hearsay statement] because reliability is required for any exception to the hearsay rule." (citing *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *California v. Green*, 399 U.S. 149, 155–57, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)). In support of this argument, appellant asserts that the Supreme Court in *Crawford* retained the "*Roberts* test for nontestimonial hearsay." (citing *Crawford*, 124 S.Ct. at 1370).

During the motion in limine hearing, when Officer George was asked who Darby had said shot him, Officer George initially said that Darby "didn't really have an answer for me." Immediately thereafter, however, when Officer George's mem-

---

naught. But dying declarations, made under certain circumstances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished." *State v. Houser* (Mo.1858) 26 Mo. 431, 438; accord, *Mattox v. United States* (1895) 156 U.S. 237, 243–244, 15 S.Ct. 337, 39 L.Ed. 409 ["from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility"]. Thus, if, as *Crawford* teaches, the confrontation clause "is not naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." (*Crawford, supra,* 124 S.Ct. at 1365, citing *Houser, supra,* 26 Mo. at 433–435), it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment. We therefore conclude the admission of Patel's dying declaration was not error.
34 Cal.4th at 764–65, 101 P.3d at 972 (footnotes omitted). *See also Harkins v. State*, 143 P.3d 706, 711 (Nev.2006) ("We agree with the states that recognize dying declarations as an exception to the Sixth Amendment confrontation right."); *Wallace v. Indiana*, 836 N.E.2d 985 (Ind.Ct.App.2005) ("We are convinced that Crawford neither explicitly, nor impliedly, signaled that the dying declaration exception to hearsay ran afoul of accused right of confrontation under the Sixth Amendment.");
*Minnesota v. Martin*, 695 N.W.2d 578, 585–86 (Minn.2005) (same); *People v. Gilmore*, 356 Ill.App.3d 1023, 293 Ill.Dec. 323, 828 N.E.2d 293, 302–03 (2005) (same).
On the other hand, the Court in *United States v. Mayhew*, 380 F.Supp.2d 961, 965–66 (S.D.Ohio 2005), accepted the argument of the defendant that the spirit of *Crawford* bars the admission of dying declarations-if testimonial.

ory was refreshed by a copy of a police report that he had written shortly after the incident, he testified that, when he asked Darby who shot him, Darby "gave the name Bobby."

There is no merit in appellant's argument that the trial judge erred when he admitted Darby's hearsay statement without considering whether the hearsay was reliable. Dying declarations and excited utterances both are hearsay exceptions "firmly rooted" in the common law. *See Bourjaily v. United States,* 483 U.S. 171, 193, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

And, in *Chapman v. State,* 331 Md. 448, 457, 628 A.2d 676 (1993), the Court of Appeals said:

Where the hearsay in question falls within a "firmly rooted" hearsay exception "no independent inquiry into reliability is required...." *Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144, 157 (1987). "Admission under a firmly rooted hearsay exception satisfied the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *[Idaho v.] Wright,* 497 U.S. [805,] 817, 110 S.Ct. [3139,] 3147, 111 L.Ed.2d [638,] 653 [(1990)] (citations omitted). However, where hearsay statements are admitted under an exception which is not considered "firmly rooted," then they are "presumptively unreliable and inadmissible for Confrontation Clause purposes" and must be excluded, at least absent a " 'showing of particularized guarantees of trustworthiness.' " *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514, 528 (1986) (quoting *Roberts,* 448 U.S. at 77, 100 S.Ct. at 2539, 65 L.Ed.2d at 608). These guarantees of trustworthiness must be such that the evidence is "at least as reliable as evidence admitted under a firmly rooted hearsay exception" so as to assure "that adversarial testing would add little to its reliability." *Wright,* 497 U.S. at 821, 110 S.Ct. at 3149, 111 L.Ed.2d at 656 (citations omitted).

*See also Gray v. State,* 368 Md. 529, 570–71, 796 A.2d 697 (2002) (no independent inquiry into reliability is required when evidence "falls within a firmly rooted hearsay exception").

Moreover, even if the two exceptions to the hearsay rule relied upon by the trial court were not "firmly rooted" in the common law, the trial judge would not have been required to make a factual assessment of the trustworthiness of the "in-court relator" (i.e., Officer George). *Gray,* 368 Md. at 545, 796 A.2d 697. The credibility of an in-court witness as to what he or she heard outside the courtroom is assessed by the trier of fact (here the jury) and not by a judge considering admissibility issues. *Id.* Thus, appellant's contention that Officer George was an unreliable relator of what he heard Darby say was a matter to be determined by the jury, not by the trial court in ruling on a motion in limine.

## V.

■ Appellant's last claim is that "the trial court erroneously used coercive language to instruct the deadlocked jury to continue to deliberate" after gaining knowledge regarding "the jury's numerical split."

The jury in this case commenced deliberation at 9:30 a.m. on the fifth day of trial. That afternoon, at 3:30 p.m., the jury sent the judge a note that read: "We have been stalemated[:] not guilty two, guilty ten."

After hearing this bad news, counsel for appellant asked the court to declare a mistrial on the grounds that "the Court and the parties are now privy to the numerical split and further deliberation, knowing that this is the numerical split, gets to be coercive." The trial judge disagreed and told counsel that he was going to give the jury an "interim instruction." Defense counsel objected to any further instruction on the ground that such an instruction was "even more coercive . . . if you now give them a specific instruction dealing with [the stalemate]." After defense counsel's objection was noted, the trial judge gave the jury the following instruction:

I have your note. And I appreciate the time you've already put in. But I'm going to have you continue to deliberate with one additional instruction. And I'll say now that *it is not unusual for there to be difficulty [sic] in part of the system. The verdict that we hope you reach must be the considered judgment of each of you, as I told you earlier. In order to reach a verdict, obviously, all of you must agree. And that is where the problem is coming in.*

Your verdict must be unanimous. You must consult with one another and deliberate with a view toward reaching agreement if you can do so without doing violence to your individual judgment. And each of you must decide this case, as I told you earlier, for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

So what that means is during these deliberations, and when you go back to deliberate, don't hesitate to re-examine your own views.

You should change your opinion if you are convinced that you are wrong, but you should not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict or an agreement on a particular charge.

My suggestion is that you re-examine the evidence, discuss it further, as if anew. And see where that takes you. It is 10 after 3:00. It is my intention to continue to have you continue to deliberate until probably around the 4:15, 4:30 mark, and then we'll see where we are, all right? So with that further instruction, please resume your deliberations.

(Emphasis added.)

After the court gave the jury the above instruction, defense counsel voiced the following objection:

Well, Your Honor, now that the Court has actually given the instructions, I renew my request for the mistrial now that the numerical split has been revealed. And not only

the numerical split. It appears they have reached a verdict as to Count 1. They are working on Count 2. We now know the inner workings of that jury. So now, giving them . . . that type of instruction, it is going to be coercive to the jurors who are in the minority, the two jurors. And I believe that is the problem with the Court's instruction. So I renew my request for a mistrial.

The trial judge disagreed with defense counsel and observed that he had no way of knowing whether the jury had reached a verdict as to Count 1. He also said (perceptively) that he did not believe that the fact that the jury had "revealed a split on a particular count" would make further instructions coercive inasmuch as the split would have existed whether or not the jury had announced the nature of their division. The court went on to reject defense counsel's argument because in its view if such logic were to obtain, any further instruction would be coercive, as would *any* further deliberation, which the court did not believe to be the law.[11]

The jury continued its deliberation until 4:35 p.m., at which time they were excused for the evening. Jury deliberations commenced the next morning, and at 10:50 a.m., the jurors returned their verdict.

Except for the emphasized portion of the instructions, and the benign two and one-half sentences that preceded it, the court's instructions were in conformity with the ABA approved Allen charge, which is set forth in the Maryland Criminal Pattern Jury Instructions. *See* MPJI–Cr 2:01 at 16 (1997).[12]

---

**11.** The court was right. *See Mayfield v. State,* 302 Md. 624, 631–32, 490 A.2d 687 (1985).

**12.** MPJI CR 2:01 reads as follows:

The verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. Your verdict must be unanimous. You must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. During deliberations, do not hesitate to reexamine your own views. You should change your opinion

Appellant now complains that the trial judge deviated from the approved language of the ABA Allen charge when he included in the instruction the words that we have emphasized in the instructions. More specifically, appellant complains that it was improper for the court to tell the jury "that a hung jury is a difficulty for the judicial system." Also, according to appellant, it was improper for the court to tell the jury that "the fact that two of them are in disagreement with the others is a 'problem.'" Appellant argues that, while "the deviation from the approved ABA instruction may appear to be slight, the coercive effect on the two jurors voting to acquit is immeasurable because the trial court is telling them they [the dissenters] are the problem." None of these reasons for objecting to the instruction were raised below.

Maryland Rule 4–325(e) provides that unless an appellate court, on its own initiative or at the suggestion of a party, takes cognizance of "plain error" contained in an instruction, "[n]o party may assign as error [on appeal] the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." In light of the provisions of Maryland 4–325(e), appellant waived the aforementioned objections.[13]

As an alternate argument, appellant alleges that the trial court abused its discretion by giving the American Bar Association version of the Allen charge after the court and counsel were advised as to the "numerical split" among the jurors. This exact contention was considered and rejected in *Mayfield v. State*, 302 Md. 624, 631–32, 490 A.2d 687 (1985). For the reasons set forth in *Mayfield*, we find no abuse of discretion.

---

if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors for the mere purpose of reaching a verdict.

**13.** Appellant does not ask us to recognize plain error in this case, nor shall we do so *nostra sponte.*

**668**

JUDGMENT AFFIRMED;
COSTS TO BE PAID BY APPELLANT.