37 A.3d 1030

**Louis BROCK a/k/a Lewis Brock**

v.

**STATE of Maryland.**

**No. 1974, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Feb. 9, 2012.

246

248

Christopher D. Heagy (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, WOODWARD, IRMA S. RAKER (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the early morning hours of March 1, 2009, Nelson Gause was fatally stabbed while dancing at Kolper's Tavern ("the Tavern"), a bar and nightclub located at 1520 Clipper Road, in Baltimore City. His friend, Michael Pryor, attempted to stop the perpetrator from fleeing the scene, sustaining cuts to his hand, head, and shoulder in the process. Before the trial in this matter, Pryor was murdered in what the parties characterize as an unrelated homicide. This appeal involves the admissibility of two statements Pryor made to the police before his death.

In the Circuit Court for Baltimore City, Louis Brock, a/k/a Lewis Brock, the appellant, was indicted on charges of first-degree murder of Gause and related crimes and attempted first-degree murder of Pryor and related crimes. A jury acquitted the appellant of all charges relating to Gause's death but convicted him of second-degree assault of Pryor. The court sentenced the appellant to a term of ten years' incarceration.

The appellant presents two questions for review, which we have rephrased:

I.  Did the circuit court err in denying his motion to suppress Pryor's statement to police at the scene of the crimes because the statement was inadmissible under the Confrontation Clause?

II. Did the circuit court err in excluding a subsequent statement made by Pryor to the police on the ground that the statement was hearsay and not subject to any exception to the hearsay rule?

For the reasons to follow, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On March 1, 2009, at approximately 1:30 a.m., Gause was stabbed in the neck while dancing at the Tavern. He collapsed, bleeding profusely. The police were called. Other patrons attempted to assist Gause, but he lost consciousness before medical personnel arrived and bled to death.

At 1:34 a.m., Baltimore City Police Officer Nuradin Admeged responded to a call for a "cutting" at the Tavern. He was the first officer on the scene. He saw Gause lying on the dance floor, bleeding, and called for medical assistance. Nearby, he saw Pryor "pacing" back and forth "bleeding from his hands." Officer Admeged approached Pryor and, as we shall discuss in more detail, Pryor said that Gause had been stabbed, that he had witnessed the stabbing, that the assailant had fled to the parking lot, and that he and the man had fought. Pryor further said he had sustained a cut to his hand as a result, and that he saw the assailant get in the passenger side of a cream-color car, which drove off. Pryor also gave a physical description of the assailant: a black male with his hair in corn rows, between the ages of 25–30, wearing a gray T-shirt, blue jeans, and Nike boots ("the March 1, 2009 Statement").

Officer Mario Vero responded to the Tavern. Soon after arriving, he left to respond to a second call reporting that a

man was "knocking on doors asking for help in the 3300 block of Falls Road," about a quarter mile from the Tavern. Officer Vero encountered the appellant on the front porch of 3341 Falls Road. He was bleeding from his hands. He had his hair in cornrows and was wearing a black polo shirt, jeans, and black boots. Officer Vero arrested the appellant and arranged for his transportation to Sinai Hospital. The appellant was treated for a broken hand and cuts to his hand and his head.

The following day, Detective Gary Niedermeier, the lead investigator on the case, went to the hospital to interview the appellant.[1] The appellant waived his *Miranda* rights and gave an oral statement.[2] He admitted being at the Tavern on the night and at the time in question and said that "something happened and everybody went outside." He stated that, while he was outside of the Tavern, he was hit from behind and got into a fight with a "light skinned male with facial hair" who looked "[l]ike a Muslim." [3]

In the months that followed the crimes, Pryor gave several statements to the police. He identified the appellant in a photographic array and in a video surveillance tape from the Tavern. On February 17, 2010, Pryor met with Detective Niedermeier and the prosecutor to prepare for trial.[4] In the meeting, Pryor denied having seen the appellant stab Gause and recanted his prior identifications of the appellant ("February 17, 2010 Statement"). On March 2, 2010, the State

---

**1.** Detective Niedermeier had a warrant for the appellant's arrest.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** It is not clear from the record whether this physical description was consistent with Pryor's or Gause's appearance. At trial, during closing arguments, the prosecutor argued that the appellant was describing Gause because Gause had a "scraggly little beard." Defense counsel argued that the appellant was describing Pryor or one of Pryor's friends who had assaulted the appellant in the Tavern parking lot.

**4.** At that time, trial was scheduled to begin on March 19, 2010. It later was postponed.

summarized Pryor's February 17, 2010 statement in a supplemental discovery notification to the defense.

As noted, Pryor was murdered on May 15, 2010. Thereafter, the appellant moved to suppress Pryor's March 1, 2009 Statement and the subsequent statements Pryor had given to the police identifying the appellant as Gause's and Pryor's assailant. On July 23, 2010, the court held a motions hearing. It denied the motion to suppress the March 1, 2009 Statement.[5]

From July 26 to 28, 2010, the case was tried to a jury. Officer Admeged related the substance of what Pryor had told him at the scene (*i.e.*, Pryor's March 1, 2009 Statement). The State's supplemental discovery notification summarizing Pryor's February 17, 2010 statement was marked as State's Exhibit 3, and was offered into evidence by the defense, unsuccessfully.

The State called as witnesses two people who had been at the Tavern on the night in question; neither had witnessed Gause being stabbed or Pryor fighting with Gause's assailant, however. Detective Niedermeier testified, however, about the statement the appellant had made while he was hospitalized. DNA evidence introduced by the State showed that a stain on Pryor's shirt contained a mixture of Pryor's DNA and the appellant's DNA.[6] Finally, the jury was shown digital video footage from security cameras in the Tavern on the night of the stabbing which, according to the State, showed the appellant holding what appeared to be a knife in his hand and fleeing from the Tavern shortly after Gause was stabbed.

We shall include additional facts in our discussion of the issues.

---

**5.** The State conceded that Pryor's subsequent statements to police were, for the reasons we shall discuss *infra,* inadmissible testimonial hearsay.

**6.** Stains on the appellant's clothing also were tested, but were found to be consistent only with his own DNA.

## DISCUSSION

### I.

### Motion to Suppress Pryor's March 1, 2009 Statement

At the motion hearing, Officer Admeged testified as follows. He was the first responder to the Tavern, arriving within three to four minutes of receiving the radio call about a "cutting." "Within seconds" of his arrival, several other officers also arrived on the scene. There were "a lot of people outside" the Tavern and many people inside as well. Some patrons continued to drink and socialize. Officer Admeged's focus was on determining whether a crime had occurred and "eliminat[ing] any and all immediate threat . . . to [the police] and potential witnesses and citizens."

Upon entering the Tavern, Officer Admeged observed Gause lying on the floor, bleeding. A woman was kneeling over him, attempting to render first aid. Officer Admeged immediately called for medical assistance. Right away his attention was drawn to Pryor, who was "pacing" nearby and appeared "agitated [and] upset." Officer Admeged could see that Pryor was "bleeding from his hands." He approached Pryor and said, "What's going on? . . . What's happening?" Pryor responded, "My friend was just stabbed." Officer Admeged testified:

> And then [Pryor] went through the—going back and forth, I'm following him. He's going to check on [Gause] and then going back and pacing himself telling me that [his] friend was just stabbed. This guy just stabbed [Gause] and [ ] ran out of the club and he's describing to me what all you know the person's description. Giving me—he's wearing Nike boots, gray shirt and giving me a description of the person and he said [the assailant] ran out of the door [and Pryor] chased him. He's actually demonstrating as he's explaining to me what all took place and I'm following him and we went outside and he showed me where the car—a car was parked.

According to Officer Admeged, Pryor told him that he and Gause's assailant got into "a fist fight" in the parking lot and Pryor "suffered a cut on his hand." Pryor told the officer that the assailant had a knife and "might have ... chucked [it] ... into the bushes on the side of the parking [lot]."[7] At some point, Officer Admeged made a second call for medical assistance with respect to Pryor's injuries.

On cross-examination, Officer Admeged testified that while he was speaking to Pryor there were at least 5 police officers present "at the door ... outside ... [and] inside the building." He estimated that it took the police "roughly[ ] half an hour" to secure the Tavern and make sure the suspect was not still there.

There was no dispute below that the March 1, 2009 Statement was hearsay. The prosecutor argued that the statement was admissible, however, as an excited utterance. *See* Md. Rule 5–803(b)(2) (excepting from the rule against hearsay a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). Defense counsel argued that the March 1, 2009 Statement was testimonial hearsay and, as such, even if it fell into a "firmly rooted exception" to the rule against hearsay,[8] it nonetheless was inadmissible at trial under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny. The prosecutor responded that Pryor's statement was non-testimonial because Officer Admeged's primary purpose in questioning Pryor was to respond to an ongoing emergency.

In ruling that Pryor's March 1, 2009 Statement was non-testimonial, the motion court reasoned as follows:

I focused with great interest on the testimony of [Officer Admeged]. Noting the rapid response in three to four

---

7. The police searched for but were unable to locate a knife at that location.

8. The appellant did not argue below that Pryor's statement did not meet the criteria for an excited utterance.

minutes of the call. The characterization of a man that he saw in the [Tavern] as on his back and bleeding noting that the officer called for medical assistance not once but twice. Once for Mr. Gause and the second time for Mr. Pryor. The language he used was pacing and upset and agitated to characterize Pryor as well as bleeding from his hands. "I approached him. I asked him what's going on? My friend was just stabbed. He's pacing back and forth." He [referring to Pryor] describes the stabber running out the door and chasing him and demonstrating and showing the officer where we were. I'm not troubled by the use of the past tense or the past perfect tense. There was a fist fight, a knife was involved. The knife may have been thrown. They might have tried to look for it. The stabber gets away. [Officer Admeged] called for a second medic for his [Pryor's] injuries. [Pryor] makes the description in the context and in a conversation that doesn't, to me, appear in the entire circumstances as being an interrogation or a formal interview.

None of the circumstances in or outside of the [Tavern] lend themselves to any sense of formal interview. The place was not secure, the first responder as the officer characterized himself, was not there for the purpose of interviewing but certainly there was—on response to cross-examination . . . "I couldn't identify the threat. The place wasn't secured yet. There was a guy there who was stabbed. It would take minutes to establish if the stabber was still in the building.["] That process was assisted by Pryor's description or discussion of the stabber to help the police to locate the threat that hadn't been identified or pinned down or secured. The location and the neighbor[hood] certainly wasn't secure. . . .

The motion court further concluded that Pryor's March 1, 2009 statement was an excited utterance, and thus was admissible as an exception to the rule against hearsay.

As noted, at trial, Officer Admeged testified over objection about the substance of Pryor's March 1, 2009 Statement.

■ The Confrontation Clause of the Sixth Amendment to the federal constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Confrontation Clause applies to prosecutions in state courts as well as federal courts. *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

■ In *Crawford,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court held that it is a violation of a defendant's rights under the Confrontation Clause to admit into evidence at trial a "testimonial" statement by a declarant who is not subject to cross-examination. Overruling its holding in *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court held that the Confrontation Clause prohibits the admission of a "testimonial" statement by a declarant who cannot be cross-examined, regardless of whether the declarant's statement bears indicia of reliability that would make it admissible under a "firmly rooted exception" to the rule against hearsay. The Court explained that

> "[t]estimony[ ]" ... is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." [2 N. Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

541 U.S. at 51, 124 S.Ct. 1354.

■ In *Crawford,* the statement at issue was given by the defendant's wife during an interview with police at the station house. At trial, the wife was not available for cross-examination because the defendant had invoked the marital privilege. Concluding quite easily that a formal statement to police at the station house is testimonial in nature, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* at 68, 124 S.Ct. 1354 (footnote omitted). The Court observed, however, that the term "testimonial" covers, at a bare minimum, "prior testimony at a

preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

Two years later, in an opinion in consolidated cases, *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court elaborated upon the meaning of "testimonial" as used in *Crawford*. Both cases involved domestic disputes. In *Davis*, the statements at issue were made to a 911 operator. The victim called 911 while her ex-boyfriend was assaulting her, reporting that he was "jumpin' on [her] again." *Id.* at 817, 126 S.Ct. 2266. She proceeded to tell the 911 operator that the defendant did not have a weapon, but was using his fists, and to give his full name and birthdate. She later informed the 911 operator that the defendant had fled the scene. At trial, the victim did not appear, and over objection the court admitted the 911 recording into evidence.

In *Hammon*, the police responded to a domestic disturbance call at the home of a married couple. When they arrived at the scene, the wife was sitting on the porch and, although she appeared "somewhat frightened," she told police "nothing was the matter." *Id.* at 819, 126 S.Ct. 2266. She gave the police permission to enter the house. Inside, they observed a gas heating unit in the corner, which had been damaged, and broken glass on the floor. The husband, who was inside the house, told the police that, although he and his wife had been arguing earlier, "everything was fine now." *Id.* After the police spoke to the wife again, inside the house but apart from her husband, she recounted that her husband had broken the heater, shoved her down on the ground into the broken glass, and punched her in the chest twice. She filled out and signed a battery affidavit. The husband was charged, but at trial the wife failed to appear. The court allowed a police officer to testify about the wife's statement at the scene and to authenticate her battery affidavit.

Because the statement in each consolidated case was

made in response to police interrogation,[9] the Court turned to the question of "which police interrogations produce testimony." *Id.* at 822, 126 S.Ct. 2266. The Court enunciated the following principle:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* (footnote omitted).

■ The Court ultimately concluded that the statement by the ex-girlfriend to the 911 operator in *Davis* was *not* testimonial but the statement by the wife to the police in *Hammon* *was* testimonial. It emphasized that the victim in *Davis* was recounting events to the 911 operator "*as they were actually happening*" and "any reasonable listener" would have recognized that she "was facing an ongoing emergency." *Id.* at 827, 126 S.Ct. 2266 (emphasis in original). Moreover, the questions asked and the answers elicited, viewed objectively, revealed that the information the victim in *Davis* had provided was necessary to allow the police to resolve that emergency. Finally, the Court noted the informality of an interview with a 911 operator, contrasting it to the formal station house interview in *Crawford:* "[the victim]'s frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.* The Court warned, however, that the primary purpose of an interrogation can shift quickly and therefore a statement that begins as a response to an ongoing emergen-

---

**9.** The Court emphasized that it was using the term "interrogation" colloquially. Moreover, while the *Davis* victim's statement was made to a 911 operator, not a police officer, the Court assumed for purposes of its analysis that a 911 operator acts as an agent of the police.

cy—and thus is non-testimonial—may evolve into a testimonial statement once the purpose of resolving the emergency has been achieved. Because the Court only was asked to decide whether the victim's initial comments to the 911 operator were or were not testimonial, it did not address the nature of the statements she made to the police after her husband fled.

In *Hammon*, in contrast, the Court held that the wife's statements were testimonial, emphasizing that, when the police responded to the scene, no emergency was in progress. The police did not witness an argument and were "not seeking to determine ... 'what is happening,' but rather 'what happened.'" *Id.* at 830, 126 S.Ct. 2266. Moreover, unlike in *Davis*, the victim in *Hammon* was separated from her attacker and protected by the police presence. The Court pointed out, however, that it was not suggesting that statements made in response to police interrogation at a crime scene necessarily are testimonial. When police first arrive at a crime scene, they must assess threats to themselves and the public at large and, "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements." *Id.* at 832, 126 S.Ct. 2266 (emphasis in original). The wife's statements in *Hammon*, however, were "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation," and, as such, were testimonial. *Id.*

At a time after the motion hearing and trial in the instant case, the Supreme Court decided *Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). In that case, Detroit police responded to a shooting call. They arrived at a gas station and found the victim, Covington, lying on the ground next to his car with a gunshot wound to the abdomen. He was in severe pain and had difficulty speaking. Police officers asked Covington "'what had happened, who had shot him, and where the shooting had occurred.'" *Id.* at 1150 (quoting *People v. Bryant*, 483 Mich. 132, 143, 768 N.W.2d 65 (Mich.2009)). Replying that "Rick" (the defendant) had shot him, Covington told the police that he had gone to Rick's house; had had a conversation with him through the back

door; when he turned to leave, Rick shot him through the door; and he managed to get in his car and drive to the gas station where the police found him. The shooting had occurred approximately 25 minutes earlier. The police spoke to Covington for about 5–10 minutes, until medical personnel arrived at the scene. Covington died of his injuries.

The *Bryant* Court held that Covington's statements to the police were non-testimonial. It observed that the case required "further explanation of the 'ongoing emergency' circumstance addressed in *Davis*" in that it presented "a non-domestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim." *Id.* at 1156. Thus, the circumstances involved a potential threat to the police and the public at large that was not present in either case in *Davis*.

■■■■ The Court emphasized that, in assessing whether a statement is testimonial in such a case, the ultimate inquiry is what was the primary purpose of the interrogation, *i.e.*, was it to meet an ongoing emergency or to establish past events for purposes of a criminal prosecution? The existence of an "ongoing emergency" is relevant to whether a statement is testimonial because "an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.'" *Id.* at 1157 (quoting *Davis, supra,* 547 U.S. at 822, 126 S.Ct. 2266) (alteration in *Bryant*) (footnote omitted). In so inquiring, a court must "objectively evaluate the circumstances in which the encounter occur[red] and the statements and actions of the parties." *Id.* at 1156. Thus, the focus is not on the subjective or actual purpose or intent of the interrogator or the declarant, but on the "purpose that reasonable participants would have had" under the same circumstances. *Id.* Moreover, the circumstances must be evaluated based on the facts as known to the participants at the time of the encounter, not in hindsight. Finally, both the questions asked and the answers elicited are

relevant in determining the primary purpose of the interrogation.

The *Bryant* Court explained that "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 1162. In the context of a domestic disturbance case (as in *Davis* ), there is a "narrower zone of potential victims" and, ordinarily, the ongoing nature of the emergency will cease as soon as the victim is protected by police presence. *Id.* at 1158. When the context is a shooting by an unknown actor, however, the emergency may continue even after the threat to the first victim has been "neutralized." *Id.* Similarly, the type of weapon used may be relevant. A fist fight ends as soon as the participants are separated. When the weapon is a gun, however, the emergency may be ongoing until such time as the armed perpetrator has been apprehended.

In *Bryant,* the victim was mortally wounded, the weapon was a gun, and the perpetrator was unknown to the police. Further, any motive for the shooting was unknown, leaving open the possibility that the shooter might be looking for Covington or that there could be other potential victims. The situation was "fluid and somewhat confused" and the questioning of Covington lacked any formality. *Id.* at 1166. All of these facts, viewed in their totality and objectively, led the Court to conclude that the primary purpose of the interrogation was to respond to an ongoing emergency. Accordingly, Covington's statements were non-testimonial and properly were admitted into evidence under a hearsay exception.

Two Maryland cases also are relevant to our analysis. The Court of Appeals decision in S*tate v. Lucas,* 407 Md. 307, 965 A.2d 75 (2009), and our earlier decision in *Head v. State,* 171 Md.App. 642, 912 A.2d 1 (2006), both applied an "ongoing emergency" analysis. The facts in *Lucas* are analogous to those in *Hammon* The police received a "[d]omestic call" and responded to an apartment in Glen Burnie. 407 Md. at 309, 965 A.2d 75. The defendant was sitting on the steps outside the apartment and his girlfriend was standing at the threshold

to the apartment. There were red marks on her neck and she was crying. While one officer stayed outside with the defendant, another officer spoke to the victim at the door to the apartment, asking her what had happened and how she had sustained the red marks on her neck. A second officer arrived a few minutes later; he also interviewed the victim. She told the police that her boyfriend (the defendant) had assaulted her.

The defendant unsuccessfully moved *in limine* to exclude the victim's out-of-court statements to the police. At trial, the victim did not appear. The court allowed the police officers to testify about the victim's statements at the scene. In an appeal from the defendant's conviction for second-degree assault, we held, in an unreported opinion, that the victim's statements to police should have been excluded under *Crawford* and its progeny. The Court of Appeals granted *certiorari* and affirmed, concluding that, as of the time the victim made her statements to the police, "[t]he emergency had ended." *Id.* at 324, 965 A.2d 75. In so deciding, the Court distinguished a series of federal cases in which the police had "encountered victims with apparent severe injuries requiring immediate medical attention and/or where an assailant had not yet been located." *Id.*

In *Head v. State,* in contrast, this Court held that statements made to police by a mortally wounded shooting victim at the scene of the crime were non-testimonial. In that case, the police responded to a call for a shooting at a home. Upon entering, they smelled gunpowder in the air and saw an injured man lying on the couch. He told the police that there was a second victim. The police followed a trail of blood to the kitchen, where they discovered Kevin Darby lying on the floor. He had been shot, but the extent of his injuries was unclear. He repeatedly said, "help me, help me." 171 Md. App. at 647, 912 A.2d 1. An officer asked Darby who had shot him, to which he replied, "Bobby." *Id.* Darby later died of his injuries.

The trial court determined that Darby's statement to police satisfied both the excited utterance and dying declaration exceptions to the rule against hearsay. At trial, the court ruled, in reliance upon a footnote in *Crawford,* that Confrontation Clause jurisprudence had not affected the dying declaration exception to the rule against hearsay,[10] and admitted Darby's statement into evidence. On appeal after conviction, we affirmed on the ground that the primary purpose of the police officer's questioning of Darby was to meet an ongoing emergency. We emphasized that, at the time the police arrived, the identity and location of the shooter were unknown. We reasoned:

> The officer needed to know, for safety reasons, who shot Darby. By way of example, if Darby had said that he had been shot by [the man lying on the couch], this information would allow the officer to take precautions to protect himself and Darby. The same would be true if Darby had given no name in response to the question but instead identified the shooter by disclosing his whereabouts (e.g., "the man who shot me is in the basement").

*Id.* at 660, 912 A.2d 1.

We now return to the facts of the instant case. Viewed objectively, the total circumstances surrounding Pryor's March 1, 2009 Statement to Officer Admeged make clear that "the primary purpose" of the officer's questioning of Pryor was to meet an ongoing emergency. When Officer Admeged arrived at the Tavern, he knew only that there had been a "cutting." Upon entering the Tavern, he observed Gause lying on the dance floor, bleeding profusely and obviously *in extremis.* He saw another man, later determined to be Pryor, "pacing" nearby and bleeding from his hands. At that point in time, Officer Admeged was aware that one man (Gause) had been very seriously injured and another man (Pryor) also was bleeding. He did not know the exact type of

---

**10.** The *Crawford* Court suggested that the Sixth Amendment might incorporate an exception with respect to testimonial dying declarations. *See* 541 U.S. at 56 n. 6, 124 S.Ct. 1354.

weapon involved (although he would have thought it was a knife or similar dangerous instrument), who the perpetrator was, or whether the perpetrator still was present in the Tavern or its parking lot, both of which were filled with people. Under the circumstances, Officer Admeged reasonably could have suspected that Pryor was the perpetrator.

Officer Admeged asked Pryor, "What's going on? . . . What's happening?"—questions that obviously suggest that the officer was trying to learn the present basic facts about the nature of the crime or crimes and the parties involved. He did not sit down with Pryor and take a statement or even take notes while he spoke to Pryor. He called for medical assistance twice between the time he arrived and the time he finished speaking with Pryor. Viewed objectively, all these facts create a picture of an ongoing emergency.

Pryor's answers to Officer Admeged's questions strongly suggest a primary purpose of assisting the police to respond to the ongoing emergency by apprehending the perpetrator. Pryor told the officer that the alleged perpetrator had just fled the scene moments earlier, after injuring Pryor. Pryor was agitated and was bleeding. Gause, whom Pryor described as his friend, was severely injured if not dead already. Pryor gave a skeletal description of the events, led Officer Admeged out of the crowded Tavern onto the parking lot, which also was filled with people, reenacted the perpetrator's attack on him (Pryor), and described the car in which the perpetrator just fled.

The chaotic, fluid, and uncertain context in which Officer Admeged questioned Pryor is analogous to the emergency situations in *Bryant* and *Head* and dissimilar to the controlled atmospheres in *Crawford* and *Lucas*. As the *Bryant* Court emphasized, "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." 131 S.Ct. at 1162. Like in *Bryant* and *Head*, when Officer Admeged arrived, there was at least one victim in critical condition and an unknown perpetrator. Moreover, whereas in *Bryant* and *Head*, the only persons

present at the crime scene were the victims and the police, here the crimes occurred at a crowded dance hall. As noted, when police arrived, there were large numbers of patrons inside and outside the Tavern. If the perpetrator was still at the scene armed with a knife, there was a serious threat to the other patrons. It was unclear whether there were additional victims. The presence of so many people at the crime scene also complicated the police efforts to identify the perpetrator (or perpetrators) and any additional victims.

The appellant makes much of the fact that Pryor was detailing past events in speaking to Officer Admeged. The victim in *Bryant* also provided a narrative of past events. *See* 131 S.Ct. at 1150 (Covington explained where and how the defendant shot him). The *Bryant* Court concluded that the facts reported by the victim to the police were of the type necessary to respond to the emergency. The same is true here. When the police are trying to identify and apprehend an at-large perpetrator of a violent crime, learning what *just happened* (not just *what is happening* at the time of the interview) is key to responding to the ongoing emergency. For all of these reasons, we conclude that the March 1, 2009 Statement by Pryor to Officer Admeged was non-testimonial. Its admission into evidence was not contrary to the Confrontation Clause; and, as the parties agree, it was an excited utterance not barred by the rule against hearsay.

## II.

### Exclusion of the February 17, 2010 Statement

As mentioned above, on February 17, 2010, Pryor met with Detective Niedermeier and the prosecutor to review the events of March 1, 2009, in preparation for the upcoming trial. What he told them that day, which was not written or recorded, is what we have referred to as his February 17, 2010 Statement.

On March 2, 2010, the State filed with the court the following supplemental discovery disclosure, which we quote in relevant part:

> On February 17, 2010, Michael Pryor was interviewed by ... Detective ... Niedermeier in the presence of Assistant State's Attorney Charles Blomquist. During the course of the interview, Mr. Pryor indicated that he did not see [the appellant] stab Nelson Gause, the homicide victim from the 1520 Clipper [ ] Road, Baltimore MD incident. Mr. Pryor denied making earlier statements that indicated that he did in fact see the stabbing death of Mr. Gause.

Thus, Pryor's February 17, 2010 Statement, to the extent it was a recantation, recanted the portion of his March 1, 2009 statement in which he said he had seen Gause being stabbed (but did not identify the stabber) and the later (inadmissible) statements by him about the appellant's being the person who stabbed Gause. It did not recant that portion of his March 1, 2009 Statement in which he had said he had been attacked by Gause's assailant.

At the July 23, 2010 motion hearing, Detective Niedermeier testified that, at the February 17, 2010 meeting, Pryor had said "he didn't want to go to Court. That he didn't want to be part of it and that he never said that the person that he picked out was the person that did it."

At trial, the appellant sought to introduce Pryor's February 17, 2010 Statement. The trial court ruled that the statement was hearsay not subject to any exception, and excluded it from evidence on that basis. On appeal, the appellant challenges the trial court's ruling, asserting that the February 17, 2010 Statement was offered for impeachment, not for substantive use, and therefore was admissible regardless of its hearsay character. The State responds that this argument was not made (or ruled upon) below and therefore under Rule 8–131(a) is not preserved for review; and, in any event, exclusion of the statement, if error, was harmless beyond a reasonable doubt.

The preservation issue requires us to detail the nature of the February 17, 2010 Statement and the arguments that were made about its admissibility *vel non*. On the first day of trial, before jury selection, defense counsel said that he had a motion (in addition to some others) concerning the February

17, 2010 Statement, which had been marked as State's Exhibit 3. Specifically, he said, "I would attempt to move that [Statement] into evidence pursuant to the Hearsay Catchall Exception, Your Honor," referencing Rule 5–803(b)(24). No ruling was made at that time.

After jury selection, the issue was raised again. Defense counsel argued that the February 17, 2010 Statement should be admissible, prefacing his remarks as follows:

> This is a hearsay statement, Your Honor. I think we can all agree on that or I would suggest that it is. It's made out of—it's an out of court statement and I am attempting to move it into evidence because the Declarant of the statement[—e]ven though Mr. Pryor is deceased. Pursuant to Rule 5–803(b)(24), it's the other exceptions. Exceptions to the hearsay rule, some call the catch all exception.[11]

Defense counsel then read that part of the rule and argued that Pryor's death was an "exceptional circumstance" that justified admission of the statement under the "catchall" exception. He acknowledged, however,

> As far as I can see the rules [sic] is not covered. I may still attempt to find a rule for which [this statement] is covered but I cannot see a rule for which the statement is covered, Your Honor. It is offered as the evidence and material fact.

---

11. Rule 5–803(b)(24), the "catchall" exception to the rule against hearsay, provides:

> (24) Other exceptions. Under exceptional circumstances, the following are not excluded by the hearsay rule: A statement not specifically covered by any of the hearsay exceptions listed in this Rule or in Rule 5–804, but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the intention to offer the statement and the particulars of it, including the name and address of the declarant.

The material fact that Mr. Pryor said he did not see—based on what's in the statement that he did not see [the appellant] commit the crimes against Mr. Pryor nor did he—was involved in the fight with Mr. Pryor. Excuse me, causing Mr. Gause and the fight with Mr. Pryor.[12]

Defense counsel went on to say that if Pryor were alive and present in court, and denied making the February 17, 2010 Statement, he could be impeached with it; and if he were present and testified consistent with the February 17, 2010 Statement, the State could try to impeach him with his earlier statement (*i.e.,* the one made on March 1, 2009).

At that point, the trial judge commented that in Pryor's March 1, 2009 Statement he did not identify the appellant as Gause's assailant; it was only in Pryor's subsequent *inadmissible* statements that he had identified the appellant as Gause's assailant. Thus, the judge observed, Pryor's recantation, in the February 17, 2010 Statement, of his identification of the appellant as Gause's attacker might not even be a "material fact" under Rule 5–803(b)(24)(A), absent the State's offering some admissible evidence that Pryor previously had identified the appellant as Gause's assailant.

In an attempt to argue that the February 17, 2010 Statement nonetheless concerned a "material fact," under the "catchall" exception to the rule against hearsay, defense counsel suggested that it really was an "impeachment statement on the hearsay statement that's coming into evidence." He did not argue that the February 17, 2010 Statement should be admitted for the limited purpose of impeachment under Rule 5–806, however.[13] His entire argument was consistent with

---

12. As noted above, the February 17, 2010 Statement did not reference the appellant's encounter with Pryor.

13. Rule 5–806 provides in pertinent part that, "[w]hen a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness," including evidence that the declarant made a statement "inconsistent with the declarant's hearsay statement...."

his prefatory remarks that the February 17, 2010 Statement was hearsay and only would be admissible if it could be shown to meet the criteria under the "catchall" exception.

Because of concerns about the materiality *vel non* of the February 17, 2010 Statement, the court held the motion under advisement until the State had presented much of its case-in-chief. The following day, after the State had called six fact witnesses (including Officers Admeged and Vero) and a DNA expert, and had admitted its exhibits, the trial judge later "revisit[ed] the 803(b)(24) motion." She asked defense counsel whether, in "light of the State's evidence," he had "anything further to offer by way of identification of the purpose of offering the statement or the circumstances in which you think I ought to view the representation as trustworthy within the meaning of 803(b)(24)." Defense counsel replied that he had "nothing further."

The court discussed *State v. Walker*, 345 Md. 293, 691 A.2d 1341 (1997), and ruled that the February 17, 2010 Statement did not satisfy the criteria for admission under the "catchall" exception in that there were no "circumstantial guarantees of trustworthiness" in the "double hearsay" contained in the February 17, 2010 Statement; that the statement could not be used as substantive proof of a material fact; that there had been no effort made by the defense to contact Pryor and take his deposition during the three months after the February 17, 2010 Statement was given to the defense and before Pryor died; and that the defense had not given adequate notice (until the morning of trial) that it intended to offer the February 17, 2010 Statement into evidence under Rule 5–803(b)(24).

From the time defense counsel first raised the issue of admitting the February 17, 2010 Statement into evidence at the outset of trial until the judge ruled the statement inadmissible after the State had called many witnesses, the defense argument for admitting the statement was that it met the admissibility requirements of Rule 5–803(b)(24), *i.e.*, the "catchall" exception to the rule against hearsay, which would

allow the statement to be used *substantively*. Clearly, given that he was on trial for the first-degree murder of Gause, the appellant wanted the February 17, 2010 Statement admitted for its truth, as evidence that Pryor did not see him stab Gause. Ultimately, the appellant was acquitted of Gause's murder, so the fact that the court ruled that the defense could not introduce Pryor's February 17, 2010 Statement as substantive proof that Pryor did not see the appellant stab Gause is of no moment. The appellant was convicted of assaulting Pryor, however, and, as explained above, he now complains that the February 17, 2010 Statement should have been admitted for the purpose of impeaching Pryor's March 1, 2009 Statement to Officer Admeged.

We conclude that, by the slimmest of reeds, the appellant preserved the issue he now raises on appeal. Notwithstanding that his entire argument focused on the admissibility of the February 17, 2010 Statement for substantive use under an exception to the rule against hearsay, he did make a reference to use of that statement for impeachment purposes: as an "impeachment statement on the hearsay statement that's coming into evidence," *i.e.*, to impeach the March 1, 2009 Statement. Given that this was but a single reference to impeachment made in the context of an argument devoted to the "catchall" exception to the rule against hearsay, it is not surprising that the court ruled solely on the basis of the hearsay argument.[14] Nevertheless, we shall treat the impeachment issue as preserved for review.

Even so, we find no merit in the appellant's impeachment argument, for two reasons. First, the February 17, 2010 Statement, although marked as an exhibit, was not independently admissible. It was a supplemented discovery response by the State to the defense advising the defense of remarks

---

14. When the trial court ruled solely in the "catchall" exception to the hearsay rule, the appellant should have brought to the court's attention that he was relying on a non-substantive impeachment basis for admissibility as well. He did not do so. Nonetheless, we will consider the merits of the argument.

Pryor had made to Detective Niedermeier (and a prosecutor) during a meeting on February 17, 2010. Pryor's remarks during that meeting were not recorded, written, or signed. Thus, to the extent that they would be admitted into evidence for any purpose, they would have had to come in through the testimony of Detective Niedermeier. There was no proffer, however, of what Detective Niedermeier was going to say as to precisely what Pryor had said during the February 17, 2010 meeting; and in particular, whether Pryor actually said he did not see Gause being stabbed at all, or whether (as the February 17, 2010 Statement marked as an exhibit said), he said he had not made any prior statement about seeing Gause being stabbed.

██ Second, even if it could be assumed that Detective Niedermeier's only testimony about what Pryor said in the February 17, 2010 meeting was that Pryor denied seeing the appellant stab Gause and denied making earlier statements that he saw Gause being stabbed, the impeachment value of that testimony would have been virtually worthless *vis-à-vis* the assault on Pryor; and therefore any error in not admitting it for impeachment was harmless.

In the March 1, 2009 Statement, Pryor did not say that he saw *the appellant* stab Gause. He said he saw Gause being stabbed, and that his fist fight in the parking lot was with the stabber. In the February 17, 2010 Statement, he did not recant anything he had said on March 1, 2009, about being attacked in the parking lot. Thus, the only possible impeachment value of the February 17, 2010 Statement as it related to the attack on Pryor would have been to show that Pryor did not know whether the person who attacked him in the parking lot was the same person who had just stabbed Gause. Yet, the appellant by his own admission was at the scene, and the scientific evidence showed a mixture of Pryor's DNA and the appellant's DNA on Pryor's shirt. We are confident, beyond a reasonable doubt, that any failure on the court's part in not allowing the appellant to use for impeachment purposes whatever testimony Detective Niedermeier may have given about

what Pryor said on February 17, 2010, had no effect on the outcome of the trial, *i.e.*, the conviction for second-degree assault of Pryor. *See Dorsey v. State*, 276 Md. 638, 658–59, 350 A.2d 665 (1976).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**